1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DOUGLAS L. DAWKINS,

11              Plaintiff,                    No. CIV S-02-2038 LKK KJM P

12       vs.

13   J. R. PETERSON, et al.,                  ORDER AND

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prison inmate proceeding pro se with a civil rights action under

17   42 U.S.C. § 1983.  In his amended complaint, plaintiff alleges that he was validated as a member

18   of the Black Guerrilla Family (BGF) prison gang and placed in segregated confinement for an

19   indeterminate term without due process and deprived of the ability to earn good time credits.  He

20   also challenges the policy denying such inmates access to the telephone.  Defendants Peterson,

21   Kopec, Johnson, Waybright and Boitano have filed a motion for summary judgment.

22   I.  Summary Judgment Standards Under Rule 56

23          Summary judgment is appropriate when it is demonstrated that there exists "no

24   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

25   matter of law."  Fed. R. Civ. P. 56(c).

26   /////

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2  1436 (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party

4  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

9  committee's note on 1963 amendments).

10         In resolving the summary judgment motion, the court examines the pleadings,

11  depositions, answers to interrogatories and admissions on file, together with the affidavits, if any.

12  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477

13  U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court

14  must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless,

15  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

16  factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines,

17  602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally,

18  to demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19  some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

20  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21  trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

22         On June 1, 2004, the court advised plaintiff of the requirements for opposing a

23  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

24  F.3d 952, 957 (9th Cir. 1998); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

25  /////

26  /////

II. Facts

Because of the long-standing gang problem in California prisons, each institution has a gang coordinator or investigator (IGI) and the Department of Corrections and Rehabilitation has a gang suppression unit under the authority of the assistant director of the Law Enforcement and Investigation Unit (LEIU). Motion for Summary Judgment (MSJ), Ex. B at 1, 2.[1]

The IGI unit for each institution works to identify gang members or affiliates. Id., Ex. D (Cal. Code Regs. 15, § 3378(c)). Before an inmate is identified as a gang associate, the IGI must have three or more independent sources of information "indicative of association with validated gang members or associates." Id., Ex. C ¶ 5; id., Ex. D (Cal. Code Regs. 15, § 3378(c)(4)). Such information may include a statement from another inmate, an inmate's own admission, tattoos, written materials, photographs, observation by staff, and information from other agencies. The regulations provide that the IGI unit can consider statements from informants only if their information is independently corroborated or the informant is otherwise known as reliable. Id., Ex. D. (Cal. Code Regs. 15, § 3321(b)(1)).

In 2001, plaintiff was a prisoner at High Desert State Prison. Amended Complaint (Am. Compl.) at 2; Motion for Summary Judgment (MSJ), Ex. A at 6. On August 17, 2001, defendant Peterson, a correctional lieutenant/institutional gang investigator, searched plaintiff's personal property and found two drawings and one tattoo pattern, each containing a dragon by itself, or with a ball and chain or medieval weaponry, symbols associated with the BGF. MSJ, Ex. E ¶ 4; id., Ex. C ¶ 10.

Peterson examined plaintiff's central and confidential files and determined that plaintiff, also known as Rasheed, met the criteria for validation as a member of BGF. He based this conclusion on the material found in plaintiff's cell; a confidential memorandum Peterson

---

[1] Defendants' exhibits are attached to their Statement of Undisputed Facts.

4

1    wrote on the day of the search; a confidential memorandum by M. Townsend, dated July 7, 2000;

2    a debriefing report dated December 20, 2000, in which plaintiff was identified as a BGF member;

3    and a confidential memorandum by August 17, 2001 by D. Shaver. Id., Ex. E ¶¶ 5, 6. All these

4    items were sent to the LEIU in Sacramento as a gang validation packet. Id., Exs. C ¶ 10, E ¶ 5 &

5    A at 21. Plaintiff was not informed of Peterson's determination or otherwise given a hearing or a

6    chance to contest any of the information before the packet was sent to the LEIU. Opposition

7    (Opp'n), Ex. B (Peterson Interrogatory Responses Nos. 3 & 4).

8            Special Agent John Harrison of the LEIU is familiar with written documentation,

9    symbols, tattoos and other materials used by the BGF. MSJ, Ex. C ¶ 8. On September 10, 2001,

10   he reviewed five items as evidence of plaintiff's membership in the BGF: drawings of dragons

11   found in plaintiff's property; a statement of purpose associated with the BGF; a confidential

12   memorandum dated July 7, 2000 in which an informant identified plaintiff as a BGF member; a

13   debriefing report dated December 20, 2000 in which plaintiff was identified as a BGF member;

14   and a confidential memorandum dated August 17, 2001 describing a letter addressed to Dawkins,

15   discussing BGF business, which was found in the property of another validated BGF member.

16   Id., Ex. C ¶ 10. Harrison accepted all five items as evidence of plaintiff's membership in BGF

17   and so validated plaintiff as a BGF member. Id., Ex. C ¶¶ 10, 12; id., Ex. E ¶ 6.

18           According to Peterson's declaration, on September 14, 2001, he advised plaintiff

19   he had been validated as a BGF member, handed him the CDC 1030 forms, which describe the

20   materials sent to the LEIU, and gave him the opportunity to rebut the evidence and present his

21   views regarding validation. Id., Ex. A at 22; id., Ex. E ¶ 7. According to plaintiff, Peterson did

22   not give him the CDC 1030 form and denied him the opportunity to defend himself. Opp'n at 11

23   & Ex. B (Peterson Interrogatory Responses Nos. 2 & 3); id., Ex. D, No. 14.[2]

24

25          [2] Plaintiff's exhibits are labeled A through G and then begin again at A. This second set
26   of alphabetically labeled exhibits will be denominated A-2, etc., which is how plaintiff refers to
     them.

1    On or about September 21, 2001,[3] plaintiff attended a meeting of the Institutional

2    Classification Committee (ICC), which was composed of Peterson, defendant Waybright, a

3    classification and parole representative, defendants Kopec and Boitano, correctional counselors,

4    and defendant Johnson, a facility captain (ICC defendants).  MSJ, Exs. D (Cal. Code Regs. 15,

5    § 3335(c)) & E ¶ 8.  Plaintiff was given copies of the CDC-1030 forms, which state generally

6    that plaintiff is a gang member, a determination reached on the basis of confidential information.

7    Plaintiff denied that he was a gang member and asked to speak to Peterson, who then explained

8    the debriefing process to him.  Id., Ex. A at 23.  The committee gave plaintiff an indeterminate

9    term in the Security Housing Unit (SHU) and referred him for transfer to the SHU at Pelican Bay

10   State Prison (PBSP).  Id.

11   Once an inmate has been validated as a gang member and placed in the SHU, he

12   must be free of any gang activity for at least six years before he may be considered for release.

13   Id., Ex. D (Cal. Code Regs. 15, §§ 3341.5(c)(5) & 3378(e)).  However, if an inmate chooses to

14   "debrief"—admit his gang affiliation, identify other gang members, and reveal all he knows

15   about gang structure–he will be released from the SHU at the end of the debriefing process.  Id.,

16   Ex. D (Cal. Code Regs. 15, § 3378.1(d)).

17   An inmate placed in the SHU receives periodic reviews, at intervals of 180 days,

18   for consideration of release to general population.  Id., Ex. D (Cal. Code Regs. 15,

19   § 3341.5(c)(2)(A).)  Plaintiff has received several classification hearings at which his gang status

20   has been discussed.  Id., Ex. A at 25-38.  However, the result of these hearings is that each time

21   plaintiff is returned to the SHU unless he debriefs.  Opp'n at 28-29[4] & Ex. E-2.

22   /////

23

24        [3]  Peterson's declaration says the ICC meeting occurred on September 21st, whereas the comments memorializing the meeting are dated September 20th.

25        [4]  The opposition is signed under penalty of perjury; those portions based on plaintiff's personal knowledge therefore are deemed an affidavit in opposition to the motion for summary judgment.

26

1    Plaintiff arrived at PBSP on January 8, 2002.  MSJ, Ex. A at 6.  Inmates in the

2  SHU are allowed to shower a minimum of three times a week; are offered exercise five days a

3  week for one and a half hours each day; are double-celled if the Associate Warden approves,

4  after review by the IGI and the LEIU; and are allowed to earn behavioral credits if they remain

5  disciplinary free for certain periods of time.  Id., Ex. G ¶¶ 6, 7, 12, 13.  When plaintiff was put in

6  segregation, however, he lost his A1-A credit earning status and the opportunity to earn 491 days

7  of good-time credit.  Opp'n at 30, 32.

8    A SHU inmate is not allowed to make routine telephone calls, but is allowed legal

9  phone calls as approved by the Litigation Coordinator.  MSJ, Ex. G ¶¶ 8-9.  If there is a family

10  crisis, an inmate is permitted to make a monitored telephone call to family members.  Id. ¶ 10.  If

11  the inmate has not heard from family for a period of time, staff members may call on the

12  inmate's behalf.  Id. ¶ 11.  This policy has been adopted to prevent criminal activity by restricting

13  communication.  Id. ¶ 8.

14  III.   Due Process, Gang Validation And The Indeterminate SHU Term

15    Plaintiff argues that he was not afforded the process that was due to him before he

16  was validated as a gang member and given an indeterminate term in the SHU.  Am. Compl. at 3.

17    A.   Liberty Interest And SHU Placement

18    The Due Process Clause of the Fourteenth Amendment protects persons against

19  deprivations of life, liberty or property.  Wilkinson v. Austin, 545 U.S. 209, 221, 125 S. Ct. 2384,

20  2393 (2005).  Those who seek to invoke the procedural protections of the Due Process Clause

21  must establish that one of these interests is at stake.  Id.  "A liberty interest may arise from the

22  Constitution itself . . . , or it may arise from an expectation or interest created by state laws or

23  policies."  Id.

24    The Supreme Court has held that "the Constitution does not give rise to a liberty

25  interest in avoiding transfer to more adverse conditions of confinement."  Id. at 222 (citing

26  Meachum v. Fano, 427 U.S. 215, 225 (1976)).  However, the Court also has held that "a liberty

1  interest in avoiding particular conditions of confinement may arise from state policies or

2  regulations, subject to the important limitations set forth in Sandin v. Conner, 515 U.S. 472 [ ]

3  (1995)." Id. Such interests generally are limited to "freedom from restraint which. . . imposes

4  atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

5  life." Sandin, 515 U.S. at 484.

6          In Sandin, the Supreme Court found no liberty interest protecting against a thirty

7  day assignment to segregated confinement because it did not "present a dramatic departure from

8  the basic conditions of [the inmate's] sentence." Sandin, 515 U.S. at 485; cf. Cato v. Rushen,

9  824 F.2d 703, 705 (9th Cir. 1987) (initial confinement in administrative segregation on the basis

10  of little, even unsubstantiated information, does not create objectionable condition).

11          In Wilkinson, supra, the Supreme Court addressed whether Ohio prisoners had a

12  liberty interest protected by the Fourteenth Amendment in not being assigned to the state's

13  "supermax" prison. Wilkinson, 125 S. Ct. at 2394-95. The Court found that because the

14  following conditions imposed "atypical and significant hardship . . . in relation to the ordinary

15  incidents of prison life," Ohio prisoners did have such a liberty interest:

16          For an inmate placed in OSP, almost all human contact is
           prohibited, even to the point that conversation is not permitted
17          from cell to cell; the light, though it may be dimmed, is on for 24
           hours; exercise is for 1 hour per day, but only in a small indoor
18          room.  Save perhaps the especially severe limitations on all human
           contact, these conditions likely would apply to most solitary
19          confinement facilities, but here there are two added components.
           First is the duration.  Unlike the 30-day placement in Sandin,
20          placement at OSP is indefinite and, after an initial 30-day review,
           is reviewed just annually.  Second is that placement disqualifies an
21          otherwise eligible inmate for parole consideration.  [Cite omitted.]
           While any of these conditions standing alone might not be
22          sufficient to create a liberty interest, taken together they impose an
           atypical and significant hardship within the correctional context.

23

24  Id.

25          Although defendants suggest that the conditions in the PBSP SHU are not as

26  severe as those present in Wilkinson, they assume, without conceding, that plaintiff may have a

8

1   liberty interest protected by the Due Process Clause of the Fourteenth Amendment in not being

2   placed in the SHU for an indeterminate term.  Mem. P. & A. in Supp. Mot. for Summ. J. at 7.

3       B.  What Process Is Due

4           Assuming plaintiff had a liberty interest in being free of segregated housing,

5   defendants argue that he received all the process due before being placed and later retained in

6   segregated housing.  Plaintiff argues, however, that he is entitled to the procedures outlined in

7   Wolff v. McDonnell, 418 U.S. 539 (1974), and that defendants did not comply with those or with

8   any lesser procedures required before validating him as a gang member.

9           What process is constitutionally due to an inmate placed in segregation depends

10  on whether the placement is disciplinary or administrative.  Toussaint v. McCarthy, 801 F.2d

11  1080, 1099 (9th Cir. 1986).  In Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003), the Court of

12  Appeals determined that California's policy of placing suspected gang members in segregation is

13  an administrative decision, undertaken to preserve order in the prison.  When an inmate is placed

14  in segregation for administrative purposes, due process requires only the following procedures:

15          Prison officials must hold an informal nonadversary hearing within
            a reasonable time after the prisoner is segregated.  The prison
16          officials must inform the prisoner of the charges against the
            prisoner or their reasons for considering segregation.  Prison
17          officials must allow the prisoner to present his views. . . . [D]ue
            process [ ] does not require detailed written notice of charges,
18          representation by counsel or counsel-substitute, an opportunity to
            present witnesses, or a written decision describing the reasons for
19          placing the prisoner in administrative segregation.

20  Toussaint v. McCarthy, 801 F.2d at 1100-01 (footnote omitted).  Plaintiff has not seriously

21  challenged the procedures at the ICC committee hearing, but argues instead that he informed the

22  committee members that Peterson had not afforded him the procedures necessary before placing

23  him in segregation, yet they refused to act.  Opp'n at 11-12.  The duties of the ICC at this hearing

24  were to "consider all available evidence or information relating to the validity of the reasons

25  given for the placement as well as the need to retain the inmate in administrative segregation . . ."

26  Cal. Code Regs. 15, § 3338(f).  Plaintiff has presented nothing suggesting that the ICC members

1    had the regulatory authority or due process-imposed duty to overrule the segregation order for

2    alleged antecedent constitutional violations.

3           In the gang validation context, an inmate is entitled to another layer of informal

4    procedures.  Before being removed from general population, the inmate must "receive some

5    notice of the charges against him and an opportunity to present his views to the prison official

6    charged with deciding whether to transfer him to administrative segregation." Hewitt v. Helms,

7    459 U.S. 460, 476 (1983).  When an inmate is validated as a gang member, the actual decision to

8    segregate is made by the IGI.  Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990); see also

9    Madrid v. Gomez, 889 F.Supp. 1146, 1276 (N.D. Cal. 1995) (the critical decision maker is the

10   IGI).  Accordingly, before his transfer to segregation, plaintiff was entitled to an "informal"

11   hearing with Peterson, the IGI.

12          While Peterson avers that he gave plaintiff copies of the CDC 1030 forms and

13   gave him an opportunity to present his views and rebut the evidence of gang affiliation, plaintiff

14   declares that he was not given the necessary paperwork nor the "right to defend himself against

15   the charges." Opp'n at 11.[5]  Although there is no constitutional right that plaintiff receive the

16   CDC 1030 forms, as opposed to receiving general notice of the allegations, the Constitution does

17   require that he be allowed to present his views.  Drawing inferences in plaintiff's favor, as

18   required, given the parties' divergent versions of events, the court concludes there is a material

19   issue of fact on the question whether Peterson gave plaintiff the opportunity to rebut the gang

20   validation on September 14, 2001.  As to this aspect of plaintiff's case, defendants' motion

21   should be denied.

22   /////

23

24          [5] The record contains a CDC-114-D form, dated 9/14/01, signed by N. Albonico who
     served it, and also signed by plaintiff.  This document informed plaintiff that he was being placed
25   in segregation because he had been validated as a BGF member; nothing in the document
     suggests, however, that plaintiff was given any opportunity at that time to rebut the allegations.
26   MSJ, Ex. A at 22.

1          C.  Evidentiary Support For Administrative Segregation Assignment

2                  In Bruce v. Ylst, 351 F.3d at 1287, the Ninth Circuit held that a determination that

3   a CDC inmate is a gang member, and therefore appropriate for assignment to an indefinite term

4   in segregated housing, must be supported by "some evidence."  The requirement of "some

5   evidence" sets a low bar, consistent with the recognition that assignment of inmates within

6   prisons is "essentially a matter of administrative discretion," subject to "minimal legal

7   limitations."  Id. (citing Toussaint v. McCarthy, 801 F.2d 1080, with respect to the minimal

8   limitations).  Even just one piece of evidence may be sufficient to meet the "some evidence"

9   requirement, if that evidence has "sufficient indicia of reliability."  Id. at 1288; Cato, 824 F.2d at

10  705 ("relevant question is whether there is any evidence in the record that could support the

11  conclusion reached by the disciplinary board" (citing Superintendent v. Hill, 472 U.S. 445, 455-

12  56 (1985) (emphases in original)); Toussaint, 926 F.2d at 803 (articulating "sufficient indicia of

13  reliability" standard).  In Bruce, for example, the court noted three pieces of evidence supported

14  the identification of the plaintiff in that case as a gang member: a sheriff's department report that

15  plaintiff was a gang associate; a probation report indicating that plaintiff's codefendant on the

16  underlying charge had been validated as a gang member; and a statement from a confidential

17  informant.  Bruce, 351 F.3d at 1288.  The court noted that "any of these three pieces of evidence

18  would have sufficed to support the validation because each has sufficient indicia of reliability."

19  Id.

20                 Defendants have filed the material relied upon by Peterson and the ICC as Exhibit

21  F, under seal, along with other information on plaintiff's gang status, generated before and after

22  the time period at issue in this action.  The court has not considered information other than that

23  relied on initially to validate plaintiff in making its determination as to whether the validation

24  challenged here was supported by some evidence.

25                 As noted above, Peterson and the ICC members considered these documents

26  during the validation process: (1) a memo dated August 17, 2001 to Peterson from D. Shaver,

1   reporting that a letter concerning gang activity to "Rasheed," who Shaver identified as plaintiff,

2   was found in the property of a BGF member; (2) a memo from the same date from Peterson to R.

3   Wong of the Investigative Services Unit, reporting that three pages of material relating to

4   principles of the BGF or one of its subdivisions was found in plaintiff's personal property and

5   attaching copies of the material; (3) a memo dated December 20, 2000, describing the debriefing

6   of a former member of the BGF, who said that plaintiff, aka Rasheed, had identified himself as a

7   BGF member to the inmate; (4) a memo dated July 7, 2000, describing the debriefing of a former

8   member of the BGF, who identified plaintiff, aka Rasheed, as a BGF officer who might have a

9   copy of the organization's constitution.  The additional piece of information, not included in

10  Exhibit F or elsewhere in defendants' evidentiary support for the motion, is Peterson's report on

11  the drawings and tattoo pattern of dragons, a symbol associated with the BGF.

12          Plaintiff argues that no evidence supports a finding that he was involved in gang

13  violence or a disciplinary or "SHUable" offense, that he was not given notice of the specific gang

14  activity he allegedly pursued, and that neither Peterson nor the ICC members independently

15  evaluated the reliability of the two debriefed inmates who provided links between plaintiff and

16  the BGF.  Opp'n at 23-25.

17          As noted above, however, when an inmate is segregated for administrative rather

18  than disciplinary reasons, the notice given may be much less specific, indeed may consist only of

19  the "reasons for considering segregation."  Toussaint v. McCarthy, 801 F.2d at 1100-01.

20  Although the CDC 1030 forms were indeed very general, they met this standard.   Moreover,

21  when an inmate is segregated for administrative rather than disciplinary reasons, there is no

22  requirement that the decision maker independently evaluate the credibility of the inmates who

23  provided the information; indeed, the nonbinding case upon which plaintiff relies suggests that

24  there is such a requirement only for disciplinary findings.  Richardson v. Selsky, 5 F.3d 616, 621-

25  23 (2d Cir. 1993).

26  /////

1    Moreover, under the very lenient "some evidence" standard, plaintiff's due

2 process rights were not violated.  The drawings seized from his cell; the letter discussing gang

3 matters, addressed to plaintiff and found in the property of a known BGF member; and the

4 materials relating to the principles of the BGF found in plaintiff's property are "some evidence"

5 with sufficient indicia of reliability to support the segregation decision even without

6 consideration of the debriefing statements from former BGF members.

7    With regard to this aspect of plaintiff's case, defendants' motion should be

8 granted.

9    D.  Periodic Review

10    In his amended complaint, plaintiff did not raise a due process challenge to any

11 subsequent reviews of the decision to place him in segregation.  In their motion for summary

12 judgment, defendants have argued the 180 day reviews given to plaintiff have fulfilled the due

13 process requirements established in Toussaint, 801 F.2d at 1102.  See MSJ, Ex. A at 25-38.

14 Plaintiff argues that such hearings are not adequate for one who has received an indeterminate

15 SHU term.  Opp'n at 29.  Because plaintiff did not plead the subsequent reviews as part of his

16 due process challenge they are not before the court and the court will not consider them in

17 resolving this motion.

18 IV.  Due Process And Good Time

19    In his amended complaint, plaintiff alleges that when he was placed in

20 segregation, he lost 491 days of good time credit, which changed his parole date from August 23,

21 2005 to December 17, 2006.  Am. Compl. at 12.  In his opposition, he notes with more clarity

22 that the ICC "decided to terminate his A1-A goodtime credit status[6] adversely changing

23 plaintiff's parole release date from August 23, 2005 to December 16, 2006."  Opp'n at 32.  It

24 appears that plaintiff did not forfeit credit already earned but did lose credit-earning capability.

25
_____

26    [6] An inmate in Work/Privilege Group A-1-A receives one day of time credits for each
day served. Cal. Code Regs. 15, § 3044(b)(2).

1  This, in turn, changed plaintiff's minimum DSL date, which is defined as "the earliest date on

2  which a DSL prisoner may be released from prison. . . . computed by subtracting all preprison

3  credit and all possible good time credit from . . . the period of confinement under the DSL and

4  adding this period of time to the reception date."  Cal. Code Regs. 15 § 2000(b)(66).

5              California Penal Code § 2933(b) provides:

6              Worktime credit is a privilege, not a right. . . . .[E]very prisoner
               shall have a reasonable opportunity to participate in a full-time
7              credit qualifying assignment in a manner consistent with
               institutional security and available resources.

8

9  The Ninth Circuit has interpreted this provision to mean that an inmate has no liberty interest in

10  his credit-earning status.  Toussaint v. McCarthy, 801 F.2d at 1095; Abed v. Armstrong, 209

11  F.3d 63, 67 (2d Cir. 2000); but see Wilson v. Jones, 430 F.3d 1113, 1121 (10th Cir. 2005)

12  (liberty interest implicated when disciplinary finding automatically, mandatorily reduced

13  inmate's credit earning status), cert. denied, ___ U.S. ___, 127 S. Ct. 158 (2006).

14  V.  Access To The Telephone

15              Plaintiff alleges that his First Amendment rights are abridged because SHU

16  inmates are denied access to the telephone.  Am. Compl. at 19.

17              "Prisoners have a First Amendment right to telephone access, subject to

18  reasonable security limitations."  Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996), amended

19  by 135 F.3d 1318 (9th Cir. 1998).  The Supreme Court has recognized that incarceration places

20  substantial restrictions on the right of association.  Overton v. Bazzetta, 539 U.S. 126, 131

21  (2003).  A court must "accord substantial deference to the professional judgment of prison

22  administrators" and consider four factors: whether the regulation has a rational connection to a

23  legitimate governmental interest, whether alternative means are open to the inmate to exercise

24  the right, what impact an accommodation would have on guards and other inmates and prison

25  resources, and whether there are alternatives to the regulation.  Id. at 132; Turner v. Safley, 482

26  /////

1  U.S. 78, 89-91 (1987).  The burden is on the inmate to disprove the validity of the challenged

2  practice.  <u>Overton</u>, 539 U.S. at 132.

3          In this case, as noted, defendants have presented evidence that denying SHU

4  inmates access to the telephone is designed to prevent criminal activity.  MSJ, Ex. G ¶ 8.

5  Plaintiff has offered nothing to suggest there is no connection between the goal and the policy.

6          Moreover, plaintiff has alternatives to direct telephone contact, through letters or a

7  counselor's calls to family.  <u>Id</u>., Ex. G ¶ 11.  As the Supreme Court has noted,

8  "[a]lternatives. . . need not be ideal; . . . they need only be available."  <u>Overton</u>, 539 U.S. at 135.

9          Defendants also suggest that the impact on staff and other inmates would be

10  substantial, for gang members can use the telephone to communicate with their confederates on

11  the street and thus to carry out further criminal activity.

12          Finally, plaintiff suggests that monitoring telephone calls is an obvious, easy

13  alternative to the restriction, one already routinely followed by prison officials.  Opp'n at 36.

14  While inmate calls may indeed be recorded, he has presented nothing suggesting how many of

15  those are actually monitored or what the staff requirements would be for monitoring such calls.

16  He has not met his burden of showing that the policy impermissibly burdens his First

17  Amendment rights.

18  VI.  <u>Motion For Release Of Exhibit F</u>

19          Plaintiff seeks release of the material contained in Exhibit F to the motion for

20  summary judgment, which the court ordered sealed.  He argues in conclusory fashion that this

21  lack of access hampers his ability to oppose the motion.

22          The court has carefully reviewed the materials contained in Exhibit F to determine

23  whether some evidence supported the decision to place him in segregation; plaintiff does not

24  suggest how his access to that material could change the court's evaluation of its evidentiary

25  weight.  <u>See</u> page 11, lines 20-24 <u>supra</u>.

26  /////

IT IS HEREBY ORDERED that plaintiff's June 19, 2006 motion for release of confidential materials is denied.

IT IS HEREBY RECOMMENDED that the summary motion be denied insofar as plaintiff alleges that defendant Peterson failed to allow him to contest the segregation order on September 14, 2001, but granted in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   January 30, 2007.

U.S. MAGISTRATE JUDGE